UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| UNITED STATES of AMERICA | ) | |
| | ) | **Criminal Action No.** |
| v. | ) | **21-10231-FDS-7** |
| | ) | |
| ROBERT MONTEIRO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS
FOR A JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

SAYLOR, C.J.

Defendant Robert Monteiro has moved for a judgment of acquittal and for a new trial. In July 2024, after a four-day jury trial, he was convicted of one count of conspiracy to distribute, and to possess with intent to distribute, a controlled substance in violation of 21 U.S.C. § 846.

After the jury's verdict, defendant moved for a judgment of acquittal under Fed. R. Crim. P. 29(c) and for a new trial under Fed. R. Crim. P. 33(a), contending that the evidence presented at trial was insufficient for a rational jury to find that he knowingly and voluntarily participated in the conspiracy.

After engaging new counsel, defendant filed supplemental motions for a judgment of acquittal and for a new trial. In his supplemental motion for a new trial, he contends that he received ineffective assistance of counsel. After a waiver of the attorney-client privilege as to that issue, the Court conducted an evidentiary hearing, at which defendant, his trial counsel, and another witness testified.

For the reasons set forth below, the motions will be denied.

# I.    Background

## A.    Factual Background

The following is a summary of the evidence presented at trial.

Starting in February 2020, the United States Postal Inspection Service ("USPIS"), along with federal, state, and local law-enforcement officials, began investigating a drug-trafficking organization operated by Patrick Joseph. In the course of that investigation, law-enforcement officials obtained warrants to seize and search eight suspicious parcels sent from Puerto Rico to Massachusetts; the parcels each contained approximately two kilograms of cocaine, concealed in air fryers. The investigators also obtained warrants to intercept wire and electronic communications, collect cell-phone location information, and install GPS devices on vehicles used by various suspects involved in the suspected criminal scheme. The surveillance efforts revealed that Joseph frequently communicated with defendant, among others, to coordinate taking possession of the suspicious parcels after their delivery at various Massachusetts addresses. The parcels would then be transported to different locations for ultimate redistribution.

From May 2020 to November 2020, investigators tracked multiple suspicious packages delivered to defendant's home. In their size, weight, and labeling, the packages were largely identical to the seized parcels that contained cocaine. Many were addressed directly to defendant, while others were addressed to persons known to defendant, but not involved in the scheme. Video surveillance also recorded defendant at his residence receiving one such package addressed to "Taji Clark"—a known alias for Joseph—even though neither Joseph nor a Taji Clark lived with defendant. That package, law-enforcement officials later confirmed, contained cocaine.

Defendant and Joseph were also observed participating in multiple drug-related

transactions together.  For example, Donald Cue, a cooperating witness, testified that he and Joseph previously went to defendant's house to "pick up some change"—that is, pick up money owed for purchased drugs—and collected more than $5,000 from defendant as part of a drug sale.[1]

On June 20, 2020, video surveillance recorded defendant entering an apartment in a building at 49 Woolson Street in Mattapan, Massachusetts.  Although the apartment was the residence of Joseph's mother, it was also used by Joseph as a stash house.  The house was undergoing renovations at the time, and was thus not occupied.  Defendant visited the site with Joseph and Cue, who testified that he saw Joseph take out a brick of cocaine while they were in the kitchen.  Joseph then cut the brick open with a knife, placed a portion of the cocaine into a plastic bag, and handed it to defendant, who then put it into his own bag.  Video surveillance recorded defendant leaving the premises with his bag shortly thereafter.

On April 10, 2021, investigators monitored a phone call between Joseph and defendant in which they agreed to meet later that day.  They did not specify a meeting location while speaking on the phone; instead, Joseph simply told defendant to "head over there right now."  Without confirming where to go, defendant responded, "I'm going to head over there."  Soon after the call, Joseph was observed entering an apartment complex at 100 Liberty Place in Randolph, Massachusetts, where he leased two apartments.  The first apartment was a largely vacant stash house where Joseph and his associates stored narcotics and conducted drug deals.[2]  The second apartment also stored narcotics and was leased using the name Taji Clark.

Ten minutes later, investigators observed defendant arrive at 100 Liberty Place and enter

---

[1] Cue further testified that he, Joseph, and defendant had known each other for several years and had been involved in a separate drug-trafficking scheme in Haiti in 2015.

[2] Law-enforcement officials later discovered a dozen kilograms of cocaine in that apartment.

the stash house.  Joseph and defendant exited the building together five minutes after that.

Defendant was observed carrying a white bag that appeared to contain cocaine.

Investigators then followed defendant as he drove approximately five minutes away to a

nearby shopping mall, also in Randolph.  There, after stopping by a few stores, he stood next to

his car in the parking lot.  After waiting for approximately two minutes, a black car pulled up

behind him.  Investigators then observed defendant place a white object—suspected to contain

cocaine—inside the passenger-side window of the black car.  He then leaned into the car,

retrieved a striped bag from the passenger, and walked back with it to his own car before driving

off from the parking lot.

Over the following week, investigators intercepted more calls between Joseph and

defendant during which they discussed arranging another meeting so that defendant could return

a pair of "sneakers" that "didn't fit."  Cue testified that they used coded language when

discussing drug transactions—"sneakers that didn't fit" referred to a bad batch of cocaine.

During one call, Joseph offered to swap two kilograms of bad cocaine with three kilograms from

a new shipment that he had recently received.  Then, on May 10, 2021, Joseph called defendant

to notify him that he would go to defendant's home to pick up his "product."  Defendant

responded that he would "bring [Joseph] the bills tomorrow."  The discussion again concerned a

coordinated drug transaction between defendant and Joseph.

A week later, on May 27, 2021, law-enforcement agents executed a search warrant at

defendant's residence, where they seized drug paraphernalia as well as the cell phone that he

used to communicate with Joseph.  Meanwhile, during a search of Joseph's residence, agents

discovered Joseph's cell phone, which contained communications with defendant concerning

addresses to which drug parcels were sent in defendant's name.  Eleven substantially identical

parcels, each containing approximately two kilograms of cocaine, were found to be connected to defendant. Some of those parcels were mailed to defendant's residence, others were addressed to defendant, and the remaining were sent to an address that defendant had provided to Joseph.

### B.    Procedural Background

Defendant and ten other individuals were indicted on July 28, 2021, on one count of conspiracy to distribute, and to possess with intent to distribute, cocaine in violation of 21 U.S.C. § 846. Defendant's trial began on July 22, 2024, and ended three days later on July 25, 2024. The jury returned a verdict finding defendant guilty of conspiring to distribute, and to possess with intent to distribute, cocaine.

On August 11, 2024, defendant filed a motion for a judgment of acquittal under Fed. R. Crim. P. 29(c) and for a new trial under Fed. R. Crim. P. 33(a). On September 11, 2024, the Magistrate Judge granted defendant's motion to appoint new counsel. On October 3, 2024, the Court granted defendant's motion for an extension of time to December 2, 2024, to file supplemental briefing as to his Rule 29(c) and Rule 33(a) motions. Defendant filed supplemental motions for a judgment of acquittal and for a new trial on November 20 and December 2, 2024, respectively. In his supplemental motion for a new trial, he contended that his trial counsel failed to provide effective assistance of counsel. The government filed supplemental opposition briefs on December 16, 2024, and defendant filed reply briefs on January 3, 2025.

On February 10, 2025, defendant filed a limited waiver of his attorney-client privilege with trial counsel to permit review of his claim of ineffective assistance of counsel. The Court conducted an evidentiary hearing on January 15 and April 4, 2025. Defendant, his trial counsel, and his former girlfriend, Domingas Gomes, testified, and defendant offered various additional exhibits.

## II.    Standard of Review

### A.    Judgment of Acquittal

A judgment of acquittal should only be granted when the evidence and reasonable inferences drawn therefrom, viewed in the light most favorable to the jury's verdict, are insufficient for a rational factfinder to conclude beyond a reasonable doubt that the defendant committed each element of the charged offense. *United States v. Pimental*, 380 F.3d 575, 584 (1st Cir. 2004). The court must consider all the evidence, both direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict. *Id.* However, the court may not assess the credibility of the witnesses, as that is "a role reserved for the jury." *United States v. Rivera-Rodriguez*, 617 F.3d 581, 596 (1st Cir. 2010) (quoting *United States v. Troy*, 583 F.3d 20, 24 (1st Cir. 2009)). Nor does the court need to be convinced that "the government succeeded in eliminating every possible theory consistent with the defendant's innocence." *Id.*

This standard is a "formidable" one, and poses an "uphill battle" to defendants challenging convictions on insufficient evidence grounds. *United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir. 2008). Nevertheless, "despite the prosecution-friendly overtones of the standard of review, [review] of sufficiency challenges is not an empty ritual." *United States v. de la Cruz–Paulino*, 61 F.3d 986, 999 n. 11 (1st Cir. 1995) (citations and internal quotations omitted).

### B.    New Trial

Under Rule 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Motions for a new trial are directed to the discretion of the court, which "may 'weigh the evidence and evaluate the credibility of witnesses, . . . [but] the remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict.'" *United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010) (quoting *United States v. Wilkerson*,

251 F.3d 273, 278 (1st Cir. 2001)). To obtain a new trial under Rule 33(a), a defendant must

show that he was "denied a fair trial" in a way that "likely affected the trial's outcome." *United

States v. Casas*, 425 F.3d 23, 38-39 (1st Cir. 2005).

## III.    Analysis

### A.    Motion for Judgment of Acquittal

The jury found defendant guilty on one count of conspiracy to distribute, and to possess

with intent to distribute, a controlled substance in violation of 21 U.S.C. § 846. "To support a

conviction for conspiracy, the evidence must show (1) the existence of a conspiracy, (2) the

defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary

participation in the conspiracy." *United States v. Paz-Alvarez*, 799 F.3d 12, 21 (1st Cir. 2015).

To demonstrate that a defendant knowingly and voluntarily participated in a conspiracy, "the

government [must] establish [defendant's] intention to join the conspiracy and to effectuate the

objects of the conspiracy." *United States v. Portalla*, 496 F.3d 23, 26 (1st Cir. 2007).

Here, defendant concedes that the government sufficiently proved the existence of a

conspiracy to satisfy the first element of the charged offense. (Mot. J. Acq. at 4; Supp. Brief

Mot. J. Acq. at 5). He instead contends that the government failed to meet its burden as to the

second and third elements—that is, his knowledge of the conspiracy and his voluntary

participation in it. (Mot. J. Acq. at 4-5).

Defendant focuses on the testimony of two government witnesses, Detective Dennis

Lynch and Postal Inspector Jeffrey Powers, who offered evidence concerning the general

practices of drug traffickers. (*Id.*). Those witnesses indicated that drug traffickers often "us[e]

priority or express mail in order to be able to track the packages, given the value of the contents."

(*Id.* at 4). Defendant contends that the government did not present any evidence demonstrating

that he himself tracked the packages containing illicit drugs. The motion describes a particular

cocaine-filled parcel that was delivered to defendant at 3:53 p.m., and retrieved by him at 4:30 p.m., after "37 minutes [had] passed." (*Id.*). On that basis, defendant argues that he "did not know of the contents of the package" and therefore "did not know[ingly] and voluntarily participate in the conspiracy." (*Id.*).

"There are many ways to show that a defendant intended to join and advance a conspiracy." *Paz-Alvarez*, 799 F.3d at 25. A defendant's knowing and voluntary participation "may be proved by direct or circumstantial evidence," *United States v. Rivera Calderón*, 578 F.3d 78, 88 (1st Cir. 2009), or other "acts that furthered the conspiracy's purposes," *United States v. McDonough*, 727 F.3d 143, 156 (1st Cir. 2013).

The evidence at trial, taken as a whole, readily permitted a rational jury to conclude that defendant knowingly and willfully participated in the conspiracy. The jury heard from a number of witnesses who provided direct testimony detailing defendant's knowledge of and willful participation in the conspiracy. (Opp. to Mot. J. Acq. at 2-4). For example, a cooperating witness, Cue, testified that the conspiracy's leader, Joseph, had informed him that defendant was responsible for retrieving the drug parcels. Cue also stated that he had observed Joseph giving cocaine to defendant and later accepting related profits from him.

The evidence also showed that defendant received parcels at his residence, consistent with cocaine shipments, addressed to him or to various aliases; met with Joseph at multiple stash houses; conducted a drug transaction in a parking lot in Randolph; spoke with Joseph over the phone about handling a bad batch of cocaine; and sent Joseph a message containing an address, to which Joseph sent cocaine parcels addressed in defendant's name. Law-enforcement officials ultimately seized 11 packages containing cocaine connected to defendant's residence or to names or addresses provided by him.

Defendant contends that the evidence nonetheless fails to prove his knowledge and intent to participate in the conspiracy. For example, he contends that the evidence concerning his drug exchange with Joseph did not necessarily suggest that he was a co-conspirator, but rather a mere drug user. (Supp. Brief Mot. J. Acq. at 6-7). However, there was no evidence at trial suggesting that defendant used drugs. Moreover, even if it is true that he did use drugs, the government need not eliminate every possible theory of innocence to preclude a judgment of acquittal. *See Rivera-Rodriguez*, 617 F.3d at 596.

Defendant also asserts that his conduct in the Randolph parking lot—which was observed by government witness Detective Marvin Wright—could have been consistent with innocent behavior. (Supp. Brief Mot. J. Acq. at 8). He asserts that the transaction involved a "Foot Locker[-]style shopping bag," which, in his view, could not have reasonably been indicative of a drug-for-cash exchange. (*Id.*). However, when evaluating the totality of the evidence, including the evidence that he visited a suspected stash house immediately before the exchange occurred, a rational jury could readily conclude that he did in fact transfer drugs in the parking lot.

Defendant also contends that his receipt of packages on Joseph's behalf does not prove that he knew what was in the packages. (*Id.* at 8-9). Again, however, the evidence cannot be evaluated in isolation. Investigators tracked suspicious packages delivered to defendant's home from May 2020 to November 2020, but continued to investigate him through May 2021 before his arrest. Several pieces of evidence obtained over that period support the jury's finding that defendant knew, or should have known, the contents of the packages. For example, intercepted calls suggested that defendant knew the location of Joseph's stash house, and law-enforcement officials observed him visit that house and exit with Joseph as he carried a bag appearing to contain cocaine. A separate call later revealed defendant communicating with Joseph about a

bad batch of cocaine, which they later appeared to swap at the stash house. And at trial, the cooperating witness Cue corroborated much of the evidence submitted by the government. A rational trier of fact could determine beyond a reasonable doubt that defendant knew, or should have known, about the drug trafficking. *See Rivera-Rodriguez*, 617 F.3d at 596.

Finally, defendant contests the evidence concerning his prior participation in a drug conspiracy with Joseph from 2011 to 2015. He asserts that even when evaluated in the light most favorable to the verdict, the evidence only "gives a reason why [defendant] might be expected to be suspicious of what [] Joseph [was] up to," but is not proof that he knew or should have known about the drug trafficking underlying the charged conspiracy. (Supp. Brief Mot. J. Acq. at 6). A rational jury, however, could interpret the evidence to show that defendant knew Joseph well and understood how drug trafficking operates. With that understanding, a juror could reasonably discredit his claim that he was completely unaware that Joseph had been sending him drug packages.

Thus, under the circumstances, a reasonable jury could find beyond a reasonable doubt that defendant knowingly and voluntarily participated in the conspiracy. The motion for a judgment of acquittal will therefore be denied.

### B.    Motion for New Trial

Defendant's initial motion for a new trial is based on three alleged errors by the Court: (1) the admission of lay testimony by a government witness concerning the common characteristics of a drug transaction; (2) the admission of evidence showing that defendant had previously traveled to Haiti to import drugs; and (3) the giving of a willful-blindness instruction to the jury. (Mot. New Tr. at 1-2). In his supplemental briefing, defendant also seeks a new trial on the ground that he received ineffective assistance of counsel during trial. (Supp. Brief Mot. New Tr. at 1).

1.    **Lay-Opinion Testimony**

Defendant first contends that a new trial should be granted because Detective Wright

provided an impermissible lay opinion when he relayed his observations of defendant's behavior

on April 10, 2021, including in the Randolph parking lot.  Detective Wright testified that, in his

experience, defendant's behavior was consistent with the traits of a typical drug transaction.

(Mot. New Tr. at 1).

The admissibility of lay-opinion testimony is governed by Federal Rule of Evidence 701,

which provides:

> If a witness is not testifying as an expert, testimony in the form of [opinions or
> inferences] is limited to [those which are] (a) rationally based on the witness's
> perception; (b) helpful to clearly understanding the witness's testimony or to
> determining a fact in issue; and (c) not based on scientific, technical, or other
> specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  The First Circuit has repeatedly held that Rule 701 permits testimony based

on the expertise that a witness gains through on-the-job experience.  *See, e.g.*, *United States v.*

*Belanger*, 890 F.3d 13, 25 (1st Cir. 2018).

The testimony at issue "fall[s] comfortably within the boundaries of permissible lay

opinion testimony."  *United States v. Valdivia*, 680 F.3d 33, 50 (1st Cir. 2012).  Indeed, courts

have "previously upheld the admission of similar lay opinion testimony about drug distribution

practices based on law enforcement experience."  *United States v. Norris*, 21 F.4th 188, 198 (1st

Cir. 2021) (citing *United States v. Moon*, 802 F.3d 135, 147-48 (1st Cir. 2015)).  Similarly,

courts have "long held that government witnesses with experience in drug investigations may

explain the drug trade and translate coded language for juries, either through lay or, if qualified,

expert testimony."  *United States v. Rosado-Pérez*, 605 F.3d 48, 56 (1st Cir. 2010).

Here, Detective Wright's testimony satisfies each of the three prongs of Rule 701.  He

personally observed and testified about defendant's exchange in Randolph.  His perspective—

11

based on his decades-long career as a drug investigator—was likely helpful to a jury unfamiliar with the patterns and practices of drug transactions.  And his opinion required no scientific or technical expertise within the purview of Rule 702.  Rather, Detective Wright based his testimony on his on-the-job experience observing drug deals throughout his career.  Thus, the admission of the testimony was appropriate, and its admission does not warrant a new trial.

### 2.    Haiti Travel Records

Defendant also takes issue with the government's presentation of evidence showing that he had previously traveled to Haiti on multiple occasions to import drugs.  (Mot. New Tr. at 2). The initial motion does not specify the legal basis of the objection, but the Court understands defendant's contention to be that the evidence constitutes prohibited evidence of prior bad acts under Fed. R. Evid. 404(b).  (*See* Opp. to Mot. New Tr. at 2; *see also* Supp. Brief Mot. New Tr. at 5-7).

"Rule 404(b) provides that evidence of a defendant's prior bad acts may not be admitted to prove his criminal character or propensity to commit crimes of the sort for which he is on trial."  *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000).  Such evidence may, however, be admitted if the evidence satisfies two tests.

First, the evidence must bear some "special relevance" to an issue in the case, without relying on "bad character or propensity as a necessary link in the inferential chain."  *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996).  Evidence may be "specially relevant if it goes to the defendant's intent, knowledge, plan, absence of mistake, or identity."  *Varoudakis*, 233 F.3d at 118.  In a conspiracy case, Rule 404(b) permits admission of prior-bad-act evidence if it "explain[s] the background, formation, and development of the illegal relationship."  *United States v. Escobar-de Jesus*, 187 F.3d 148, 169 (1st Cir. 1999).

Second, under Rule 403, evidence that is "specially relevant" may nonetheless be

excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Varoudakis*, 233 F.3d at 118.  Because all evidence "[b]y design . . . is meant to be prejudicial," courts focus on whether the evidence is unfairly prejudicial.  *See United States v. Rodriguez-Estrada*, 877 F.2d 153, 156 (1st Cir. 1989).  Evidence is unfairly prejudicial if it "invites the jury to render a verdict on an improper emotional basis."  *Varoudakis*, 233 F.3d at 122.  Evidence that is "undeniably explosive," "shocking," or "heinous" is very likely to be unfairly prejudicial.  *See, e.g.*, *United States v. Moccia*, 681 F.2d 61, 64 (1st Cir. 1982).  Moreover, evidence may be improper under Rule 403 if the prosecution "generaliz[es] a defendant's earlier bad act into bad character and tak[es] that as raising the odds that he did the later bad act now charged."  *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

Here, the evidence of defendant's travels to Haiti satisfies the requirements of both Rule 404(b) and Rule 403.  The government submitted the evidence to corroborate Cue's testimony that defendant had previously collaborated with Joseph to retrieve cocaine from Haiti on Joseph's behalf.  Although not admissible to prove character or propensity, the evidence does shed substantial light on defendant's knowledge of and willing participation in the charged drug conspiracy, thereby satisfying the "special relevance" test.  At a minimum, defendant's travel on Joseph's behalf to acquire cocaine is evidence of his awareness of Joseph's drug-trafficking practices.  Moreover, the travels to Haiti help explain the background of defendant's relationship with Joseph, with whom he participated in the charged conspiracy.  The travel records were therefore properly admitted under Rule 404(b).

As for the Rule 403 analysis, the risk of unfair prejudice does not substantially outweigh the evidence's probative value.  Defendant's past travels to Haiti are highly probative as to a necessary element of the charged conspiracy—that is, his knowing and willful participation.

13

Although the prior act shares similarities with the charged offense, the evidence was not "shocking" or likely to evoke an emotionally biased response from the jury. Nor did the prosecution suggest that defendant's past travels to Haiti were evidence of criminal propensity. Instead, the evidence was offered in a limited capacity to show only that defendant knew Joseph and that he was familiar with drug-trafficking schemes. Thus, the evidence was properly admitted under Rule 403 and does not justify granting a new trial.

### 3.  Willful-Blindness Instruction

Next, defendant argues that the Court erred in providing a willful-blindness instruction, asserting that it impermissibly shifted the burden of proof to defendant.

A willful-blindness instruction is proper if "(1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge." *United States v. Azubike*, 564 F.3d 59, 66 (1st Cir. 2009). Direct evidence of the defendant's willful blindness is not required. *See United States v. Singh*, 222 F.3d 6, 11 (1st Cir. 2000). Rather, all that is needed is a "sufficient warning sign[]" from the record signaling that the defendant may have deliberately avoided knowledge of the crime. *Id.* The three requirements for a willful-blindness instruction are satisfied here.

First, defendant argued that he lacked knowledge of the conspiracy. Indeed, his post-verdict motions continue to raise this point, repeatedly maintaining that "he did not know [about] or voluntarily participate in the conspiracy." (Mot. J. Acq. at 4-5).

Second, the facts of the case strongly support a finding that defendant knew about the conspiracy; if not, there is sufficient evidence to suggest that he deliberately avoided learning

about it.[3]  For example, defendant collected drug parcels at his residence on Joseph's behalf, when he knew that Joseph had previously trafficked cocaine.  Some of the packages were addressed to defendant, while others were addressed to an alias.  Defendant also sent several messages to Joseph containing specific addresses, to which Joseph sent drug parcels.  And investigators observed defendant meet with Joseph at multiple suspected stash houses. Altogether, the evidence strongly supports a finding that defendant either knew the packages contained drugs or consciously ignored obvious indications that he was assisting a drug-trafficking operation.

Third, the instruction provided to the jury did not mandate an inference of knowledge. The instruction informed the jurors that they *may* infer that defendant knew of a fact to which he deliberately closed his eyes, but only if the jury found that (a) there was a high probability that defendant was aware of the fact in question and (b) defendant consciously and deliberately avoided learning that fact.  The instruction did not require the jury to infer the knowledge; it only gave the jury permission do so.  Nor did the instruction shift the burden of proof, as defendant contends.  The instruction clearly stated that the government must prove all the elements of the crime charged, ensuring that the jury knew that the burden of proof remained with the government.

In short, the willful-blindness instruction was appropriate and is not a basis for granting a new trial.

---

[3] A willful-blindness instruction is permissible even when the evidence supporting willful blindness overlaps with the evidence supporting actual knowledge.  *Azubike*, 564 F.3d at 68.  "[T]here is always some overlap between the evidence that a defendant knew a fact and the evidence that, if he did not know it, he ought to have known it."  *United States v. Anthony*, 545 F.3d 60, 65 n.7 (1st Cir. 2008).  Here, much of the evidence showing defendant's knowledge of the conspiracy may also permissibly support a finding of willful blindness, as "these theories can coexist."  *United States v. Griffin*, 524 F.3d 71, 78-79 (1st Cir. 2008).

### 4.    Ineffective Assistance of Trial Counsel

Finally, defendant seeks a new trial on the ground that he received ineffective assistance of counsel at trial. The Constitution does not guarantee a perfect or successful defense to any defendant. *Moreno-Espada v. United States*, 666 F.3d 60, 65 (1st Cir. 2012). Instead, "the performance standard is that of reasonably effective assistance under the circumstances." *Lewis v. Gelb*, 2014 WL 757141, at *2 (D. Mass. Feb. 21, 2014) (quoting *United States v. Natanel*, 938 F.2d 302, 309-10 (1st Cir. 1991)). To establish a claim of ineffective assistance, a defendant must show that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Put another way, defendant must prove that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *United States v. De La Cruz*, 514 F.3d 121, 140 (1st Cir. 2008) (citations omitted).

To succeed on a claim of ineffective assistance of counsel, a defendant must show both (1) deficient performance by his counsel and (2) resulting prejudice. *Peralta v. United States*, 597 F.3d 74, 79 (1st Cir. 2010) (citing *Strickland*, 466 U.S. at 687). To show deficient performance, a defendant must demonstrate that his counsel's performance failed to meet an objectively reasonable standard. *Strickland*, 466 U.S. at 687-88. Counsel's performance itself is evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances[.]" *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). There is a "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "Among other things, trial counsel is under no obligation to raise meritless claims and failure to do so does not constitute ineffective assistance of counsel." *Lewis*, 2014 WL 757141, at *3 (quoting *Acha v. United States*, 910 F.2d 28, 32 (1st

Cir. 1990)).

To prove prejudice, a defendant must show a reasonable probability that the outcome of the proceeding would have been different but for his counsel's alleged error. *Strickland*, 466 U.S. at 694. An error by counsel, even if objectively unreasonable, "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Lewis*, 2014 WL 757141, at *3 (citing *Strickland*, 466 U.S. at 692).

Here, defendant points principally to trial counsel's decision not to introduce certain evidence at trial, including the testimony that he says he would have given had he testified. Specifically, defendant contends that counsel failed to introduce evidence that would have rebutted the following aspects of the government's case-in-chief: (1) his prior participation in a drug conspiracy with Joseph in Haiti from 2011 to 2015; (2) the drug exchange between defendant and Joseph at the Mattapan stash house; (3) his cash-for-drugs exchange with Joseph; and (4) the Randolph parking-lot drug sale.

Among other things, defendant asserts that he did not testify at trial because counsel advised against doing so, and that he did not know that he could disregard that advice. He maintains that, had he known, he would have elected to testify.[4]

### a.    Travel to Haiti

Defendant asserts that counsel unreasonably failed to offer certain evidence, including photographs and videos, from his previous trips to Haiti. In his view, the images demonstrate that his travel to Haiti was recreational and not part of a drug-trafficking scheme. The photos include stills of defendant alone in front of a waterfall, beside a pool, and in front of a mirror.

---

[4] Defendant executed a limited waiver of the attorney-client privilege on February 10, 2025, to permit his trial counsel to discuss his representation of defendant, produce written communications related to the claim of ineffective assistance of counsel, and to testify at an evidentiary hearing about that issue.

(Supp. Mot. New Tr. at 4-9).  Although the photos may be consistent with a narrative that defendant's trips were mere vacations, they do not contradict the alternative view that he was in Haiti to facilitate drug trafficking.  In fact, the photos do not appear suggestive of any particular purpose of the trips.  Furthermore, the images directly undermine defendant's assertion that the trip was a "guys['] trip," as he is the only person to appear in any of the photographs.  (Supp. Opp. Mot. New Tr. at 4).

The photos would have presented other issues for defendant as well.  For example, he testified at the evidentiary hearing that he had taken multiple trips to Haiti that were typically paid for by Joseph and lasted only one or two days.  According to defendant, he would deliver certain packages on Joseph's behalf to individuals in Haiti.  A reasonable jury could view that testimony as evidence that, at a minimum, the trips were not mere vacations and defendant knew he was furthering Joseph's drug-trafficking activities.  Indeed, at the evidentiary hearing, trial counsel testified that he did not seek to offer the photos as evidence in part because he was concerned that they would weaken defendant's lack-of-knowledge defense.

Moreover, trial counsel contends that defendant's Haiti photos would have posed additional risks to the defense.  Defendant's mother—with whom he lived and had a close relationship—was unaware that he had ever even traveled to Haiti, much less that he had done so on at least four previous occasions.  Similarly, defendant's former girlfriend, Domingas Gomes, testified that she picked him up at Boston Logan International Airport after a trip to Haiti on one occasion.  She testified that he was alone at the airport and was not traveling with any friends.  And she testified that he had never told her that he had visited the country multiple times before.  Taken together, trial counsel's decision not to present defendant's images from Haiti at trial was entirely reasonable.

Separately, defendant seeks to re-litigate the Court's decision to admit evidence concerning defendant's prior drug-trafficking conspiracy with Joseph. Specifically, defendant asserts that counsel failed to adequately argue that the evidence concerning his visits to Haiti from 2011 to 2015 was inadmissible under Rule 404(b), and that Cue's related testimony was inadmissible hearsay.

Both parties thoroughly briefed and argued the issue of whether evidence concerning defendant's visits to Haiti should be admitted under Rule 404(b). (ECF Nos. 484, 495). Trial counsel timely opposed the government's motion in limine to admit such evidence and raised reasonable objections to the Court's determination.[5] Although the Court ultimately concluded that the evidence was admissible, counsel was objectively reasonable in arguing on defendant's behalf on the issue.

Defendant also contends that trial counsel's handling of Cue's testimony concerning the Haiti drug conspiracy represented ineffective assistance. That testimony was admitted under Rule 801(d)(2)(E), which excludes from the definition of hearsay a statement "by the party's co[-]conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Defendant asserts that counsel unreasonably failed to argue that defendant's trips to Haiti constituted, at most, a separate conspiracy than the one charged in the present case.

However, co-conspirator statements may be admitted even if they are made in furtherance of a different conspiracy than the one charged. *See U.S. v. Dunn*, 758 F.2d 30, 39 (1st Cir. 1985) (explaining that the co-conspirator exclusion applies to statements "even if

---

[5] Again, the Court found the evidence concerning defendant's prior drug conspiracy with Joseph from 2011 to 2015 to satisfy Rule 404(b)'s requirements because it tended to show defendant's knowledge of drug-trafficking operations and his familiarity with Joseph's practices, without being dangerously prejudicial in substance or presentation.

the[y] . . . had grown out of a wholly different conspiracy"); *see also United States v. Marino*, 277 F.3d 11, 26 (1st Cir. 2002) (stating that "[w]hether this was a separate conspiracy . . . makes no difference so far as the admissibility of the statement . . . is concerned"). Rule 801(d)(2)(E) applies so long as it was "more likely than not that the declarant and the defendant were members of *a* conspiracy when the hearsay statement was made[.]" *Dunn*, 758 F.2d at 39 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)) (emphasis in original). In fact, the co-conspirator exclusion may be invoked even if no conspiracy is charged at all. *See United States v. DiRosa*, 761 F.3d 144, 155 (1st Cir. 2014). Thus, Cue's testimony concerning the Haiti drug conspiracy was admissible, regardless of whether defendant's dealings in Haiti from 2011 to 2015 were separate from or connected to the charged conspiracy. And because the Court found that, based on all the evidence, it was more likely than not that Cue, Joseph, and defendant were members of a conspiracy to traffic drugs from Haiti, the statement was properly admitted. *See Petrozziello*, 548 F.2d at 23.

Trial counsel appropriately objected to the Court's ruling and cross-examined Cue on his testimony. Even if he had emphasized the time gap between defendant's activities in Haiti and the charged conspiracy, it would not have affected the Court's determination on the issue. Counsel is not expected to raise claims that are without merit, and counsel's failure to do so does not constitute ineffective assistance. *See Lewis*, 2014 WL 757141, at *3.

Defendant finally asserts that trial counsel acted unreasonably in failing to move for mistrial based on the Court's evidentiary ruling on Cue's co-conspirator testimony. (Add. Supp. Brief Mot. New Tr. at 1-2). Again, the statements were properly admitted under Rule 801(d)(2)(E).[6] Trial counsel would not have succeeded in moving for a mistrial, which is only

---

[6] To support his claim that a mistrial was warranted, defendant relies on the Court's remark that the government must establish that the statements provisionally admitted under Rule 801(d)(2)(E) were made in

granted when "manifest necessity requires it." *United States v. Theodore*, 354 F.3d 1, 6 (1st Cir. 2003) (citing *Illinois v. Somerville*, 410 U.S. 458, 462 (1973)).

In sum, trial counsel's handling of evidence related to defendant's travel to Haiti does not provide a basis for a claim of ineffective assistance.

### b.  <u>Mattapan Drug Exchange</u>

Defendant next contends that trial counsel unreasonably failed to offer certain surveillance images of defendant with Joseph and Cue at the stash house in Mattapan in June 2020.  (Supp. Opp. Mot. New Tr. at 9-23).  At trial, the government submitted photographic stills taken from a pole-camera video recording showing defendant entering the building with Joseph and Cue.  Cue testified that Joseph provided defendant with a bag of cocaine while they were inside the house.

Defendant asserts that other photographic stills from the same video recording demonstrate that Cue was an unreliable witness, but that his trial counsel nevertheless decided not to use them at trial.  The omitted images show Cue briefly exiting the house at various points to retrieve items from his car.  Others show defendant speaking with Joseph on the porch without Cue.  Defendant contends that those photos challenge Cue's credibility as a witness and support defendant's contention that he was not at the stash house for drug-related purposes.

However, it was not objectively unreasonable, nor prejudicial to defendant, to decide not to offer those additional images into evidence.  First, the photos do not meaningfully undermine the government's case.  The images show Cue temporarily leaving the house for a seven-minute period.  He later departed from the house by himself, before defendant had left.  But Cue

---

furtherance of a conspiracy, and that if the government fails to do so, "it's *possibly* a mistrial."  (Reply to Supp. Opp. Brief Mot. New Tr. at 2-3) (quoting Trial Transcript, Vol. 2 at 7:16-17) (emphasis added).  That is simply a statement of the applicable law, and in any event, the government properly laid the foundation for admission of the co-conspirator statements.

nevertheless overlapped with defendant and Joseph inside the house for at least 12 minutes, a period during which he could have plausibly witnessed the asserted drug exchange. A rational juror could therefore reasonably rely on Cue's testimony that Joseph gave drugs to defendant inside the house while Cue was present.

Moreover, the images of defendant speaking with Joseph on the porch could further enforce the government's position that defendant was well-acquainted with Joseph—and, by extension, the drug conspiracy—therefore weakening his lack-of-knowledge defense. Thus, it was not unreasonable for counsel to decide not to offer the additional surveillance stills into evidence, as they likely would have had a damaging effect—or, at best, no effect at all—on the jury's view of defendant's culpability.

Beyond that, defendant asserts that had he taken the witness stand, he would have provided testimony as to an alternative, harmless reason for his presence at the house. Specifically, he contends that he was at the house simply to look at construction work performed by Joseph. But counsel had good reason not to call defendant as a witness to provide that testimony. First, a jury would have substantial reason to doubt the veracity of defendant's account of the events. According to defendant, he drove more than 30 minutes on back roads to the apartment; briefly looked at the construction work; took a 15-minute bathroom break; stood outside of the house for a period of time; then drove more than 30 minutes back home—simply to "hang out" with Joseph. A jury might well question why defendant drove for more than an hour round trip for that purpose, as opposed to doing so to participate in a drug transaction. Moreover, at a minimum, defendant's account of the events does little to discredit Cue's testimony that Joseph provided drugs to defendant inside the house—testimony that a rational jury could still soundly credit. Finally, if defendant had testified, he would have exposed himself

to the numerous risks of cross-examination by the government. *See Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). It was a reasonable litigation tactic on trial counsel's part to advise against taking on such risk, particularly when the potential benefit of defendant's testimony was minimal.

In sum, trial counsel's handling of the evidence concerning the Mattapan drug exchange does not constitute ineffective assistance of counsel.

### c.    Cash-for-Drugs Exchange with Joseph

Defendant next contends that trial counsel unreasonably failed to introduce evidence to rebut Cue's testimony that defendant paid $5,000 to Joseph for drugs. He maintains that he had purchased a car from Joseph and that the cash payment was related to that purchase. He therefore contends that his counsel's failure to introduce evidence concerning his ownership of the car was unreasonable because it would have demonstrated that the payment was not related to drug trafficking.

Trial counsel testified at the evidentiary hearing that he did not believe that the car-ownership records would be beneficial to defendant's case, and may well have been detrimental to it. Counsel testified that defendant was unable to provide him with a bill of sale verifying the purchase, raising doubts as to the legitimacy of the purchase. In fact, the vehicle's history report showed that the previous owner of the car was defendant's brother, not Joseph. Indeed, Joseph never owned the car. It is true that the mother of Joseph's child had at one point been the car's legal owner, but the history report indicates that she transferred title to an unrelated third-party, who later transferred it to defendant's brother. Because Joseph had never owned the car, a jury reviewing the vehicle's history report could reasonably discredit defendant's assertion that his payment to Joseph was part of a car purchase. Thus, trial counsel did not perform unreasonably in declining to introduce evidence concerning the car's ownership.

###### d.    <u>Randolph Parking-Lot Drug Sale</u>

Defendant next asserts that his trial counsel unreasonably failed to call him as a witness to testify that his conduct at the Randolph parking lot in April 2021 did not involve a drug sale. Defendant maintains that he went to the shopping mall to eat at a local Vietnamese restaurant and to obtain a box from a shipping store to mail shoes that he had sold online. He testified that he does not recall the details of the interaction with the passenger in the black car, but posits that he likely sold health supplements, not drugs.

As trial counsel noted at the evidentiary hearing, eliciting defendant's testimony about the events in the parking lot would likely have been damaging to his case. Shortly before he drove to the parking lot, defendant had visited a stash house in Randolph with Joseph.[7] Investigators observed defendant emerge from that apartment building with a bag that appeared to contain cocaine. Cue also testified that Joseph regularly sold drugs from that apartment. Thus, a jury could reasonably conclude that defendant had acquired drugs from a stash house immediately before he drove to the strip-mall parking lot to make a sale.

Moreover, defendant's proffered account of the events in the parking lot itself would not materially undermine the government's case. One issue, as trial counsel noted at the evidentiary

---

[7] At the evidentiary hearing, defendant denied that the Randolph apartment was used as a stash house. However, that assertion contradicts Cue's testimony that Joseph regularly stored drugs at that apartment and conducted drug deals from there. Moreover, defendant concedes that the apartment was, at minimum, a designated meeting spot for him and Joseph. As one example, earlier in the day in which defendant drove to the Randolph parking lot, Joseph called him to arrange a meeting, but did not specify the meeting location. Nevertheless, defendant apparently understood that he was to go to the Randolph apartment, located 15 minutes away by car, where he convened with Joseph. He was then observed leaving the building with what appeared to be a bag of cocaine.

Defendant maintains that he merely took an educated guess as to Joseph's whereabouts that day. But a jury would have reason to doubt that claim, given that defendant had allegedly visited the Randolph apartment on only five occasions over the prior five years. Indeed, at the evidentiary hearing, trial counsel testified that he was concerned about the harmful effect that the evidence concerning the Randolph apartment meeting would have on defendant's case. Thus, counsel reasonably declined to elicit that testimony.

hearing, is that defendant does not have a substantial recollection of the parking-lot events.  For example, he does not recall any details concerning the observed interaction he had with the passenger in the black car.  Trial counsel testified that he was concerned about defendant's inability to provide any information about the person with whom he met.  His inability to recall that interaction also stands in stark contrast to the testimony provided by Detective Wright, who stated that he observed the interaction and that, in his experience, defendant's behavior was consistent with the traits of a typical drug transaction.  Trial counsel cross-examined Detective Wright, but asserts in his affidavit that he did not believe additional testimony from defendant would have benefitted his case, especially because he did not provide any information about the person in the car with whom he interacted.[8]

In sum, counsel's handling of the Randolph parking-lot evidence, including his decision not to call defendant to testify about his recollection of those events, does not constitute ineffective assistance.

### e.   Decision to Testify at Trial

Defendant finally asserts that his counsel unreasonably failed to make clear that the decision about whether to testify belonged to defendant alone.  He does not suggest that counsel coerced him to not testify.  Rather, he maintains that counsel recommended against doing so, which effectively constituted a decision on defendant's behalf to not testify because he did not know that he could disregard counsel's advice.  He further asserts that counsel's recommendation prejudiced him because he would have otherwise provided testimony that

---

[8] Trial counsel also asserts in his affidavit that he did not believe that calling additional witnesses to speak to defendant's frequent visits to the Vietnamese restaurant would be admissible or beneficial to his case.  Whether defendant visited that restaurant or other nearby stores does little to refute the evidence that he sold drugs in the parking lot.  Thus, defendant was not prejudiced by counsel's decision not to call other witnesses to testify that defendant frequented the restaurant.

would have raised reasonable doubt as to his guilt.

Of course, "a defendant's right to testify in his own defense is a fundamental constitutional right," and the defendant's lawyer "bears the primary responsibility of informing and advising the defendant of this right, including its strategic ramifications." *Smith v. Dickhaut*, 836 F.3d 97, 104 (1st Cir. 2016) (citations omitted). If counsel fails to inform a defendant of his right to testify, "silence alone cannot support an inference of such a waiver." *Rosenthal v. O'Brien*, 814 F. Supp. 2d 39, 52-53 (D. Mass. 2011), *aff'd*, 713 F.3d 676 (1st Cir. 2013) (citations omitted). However, no specific requirements govern the nature and content of the lawyer's conversation with his client concerning the right to testify. *Dickhaut*, 836 F.3d at 104. And crucially, advising a defendant not to testify may be a reasonable trial strategy and does not necessarily constitute deficient assistance. *See Siciliano v. Vose*, 834 F.2d 29, 31 (1st Cir. 1987).

Here, defendant's claim includes two related, but distinct issues. First, he asserts that counsel, not he, decided that he would not testify at trial. However, defendant conceded at the evidentiary hearing that his decision to not testify was a "collective decision" made with counsel. Thus, defendant acknowledges that he did participate in the decision and that it was not a unilateral—let alone a coerced—determination by counsel.

Trial counsel also credibly testified that he informed defendant multiple times about his right to testify, including after the government rested its case. And he testified that he prepared defendant to testify and informed him that, if he did decide to take the witness stand, he would be subject to cross-examination by the government.[9] It may be that defendant deferred to counsel's

---

[9] Trial counsel also noted that a few days before trial, the government produced text messages from Joseph that implicated defendant in the drug-trafficking conspiracy. He discussed the text messages with defendant, who then instructed counsel to ask the government if a previously offered plea deal was still available. The government informed counsel that the plea deal was no longer available at that time.

advice, but that does not constitute a constitutional violation.  Thus, between defendant's joint decision with counsel and the apparent notice that counsel provided about his right to testify, counsel did not provide ineffective assistance.

Defendant contends that counsel's decision not to call him to the witness stand was nonetheless objectively unreasonable.  Even assuming that he wanted to testify at the time of trial, as discussed, he has not indicated that counsel's advice against testifying was objectively unreasonable.  None of his purported testimony seriously challenges the evidence put forth by the government.  If anything, it only raises doubts as to defendant's credibility.  Thus, counsel reasonably advised against testifying given its limited benefit, and significant potential risk, to defendant's case.

In sum, defendant has not demonstrated that he received ineffective assistance of counsel. The Court will therefore deny defendant's motion for a new trial.

## IV.    **Conclusion**

For the foregoing reasons, defendant's motions for a judgment of acquittal and for a new trial, and his supplemental motions for a judgment of acquittal and for a new trial, are DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  April 18, 2025                                Chief Judge, United States District Court